UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

```
                                    )
CARLOS A. ROMERO, JR.,              )
        Plaintiff,                  )
                                    )
            v.                      )    CIVIL CASE NO. 94-2503
                                    )
COLEGIO DE ABOGADOS                 )
DE PUERTO RICO,                     )
        Defendant.                  )
                                    )
```

**MEMORANDUM AND ORDER**

October 19, 2010

Saris, U.S.D.J.[1]

## I.  INTRODUCTION

Plaintiff, Carlos A. Romero, Jr. ("Romero"), has moved for an order holding respondent Colegio de Abogados de Puerto Rico ("Colegio"), the integrated bar association of Puerto Rico, in civil contempt for allegedly violating this Court's permanent injunction of September 26, 2002, which prohibited the Colegio from collecting "that portion of [plaintiff's] future annual membership dues attributable to the Colegio's mandatory group life insurance program." Romero v. Colegio de Abogados de Puerto Rico, No. 94-2503, 16 (D. Mass. Sept. 26, 2002) (Romero III). After two non-evidentiary hearings,[2] some limited discovery, and

---

[1]    Of the United States District Court for the District of Massachusetts, sitting by designation.

[2]    Neither side requested an evidentiary hearing, although the Court offered to conduct one.

supplemental briefing, the Court **ALLOWS** plaintiff's Motion to Hold Defendant In Contempt, to Enforce Permanent Injunction, and For Sanctions [Docket No. 133].

## II. BACKGROUND

Respondent Colegio is an integrated bar association.  Until 2009, membership in the Colegio was required in order to practice law in the courts of the Commonwealth of Puerto Rico.[3]  P.R. Laws Ann. tit. 4, § 774 (2009).  The Colegio collects membership dues and has income from the sale of notarial and bar stamps, and from other sources.  Plaintiff Romero joined the Colegio as a member in 1979.

This litigation began in November 1994, when plaintiff filed a verified complaint pursuant to 42 U.S.C. § 1983 challenging the Colegio's use of his membership dues to fund its mandatory group life insurance program.  The district court dismissed Romero's complaint on the Colegio's motion for summary judgment.  Romero v. Colegio de Abogados, 59 F. Supp. 2d 260 (D.P.R. 1999) (Romero I).  On appeal, the First Circuit vacated the entry of summary judgment and remanded the case for adjudication of plaintiff's

---

[3]     In November 2009 the Puerto Rico legislature enacted a law that made membership in the Colegio voluntary. Motions Hearing 30:23 - 31:14, December 8, 2009; see also, Brown v. Colegio de Abogados de Puerto Rico, 613 F.3d 44, 50 (1st Cir. 2010) (Romero IV).  However, the legislature is currently considering a bill that would reestablish compulsory membership. Measure Presented to Reinstate Bar Association Compulsory Membership, P.R. Daily Sun (Aug. 26, 2010), http://www.prdailysun.com/?page=news.article&id=1282802363.

constitutional claim.  <u>Romero v. Colegio de Abogados</u>, 204 F.3d 291 (1st Cir. 2000) (<u>Romero II</u>).  As discussed in <u>Romero II</u>, in 1992, the Puerto Rico Supreme Court established regulations governing the Colegio's use of membership dues that group the Colegio's activities into Category I activities which are germane, and Category II activities which are not.  Citing Rule 5(B), the First Circuit pointed out:  "The Regulations establish a procedure by which members who do not wish to contribute to category II expenditures can pay reduced dues."  Rule 5(B) provides:

> Computation of annual dues for bar members who choose not to finance second-category activities [non-germane activities] shall be based on the classification of the activities included in the Rule 4(B)(2) statement of income and expenses.  The annual dues shall be an amount equal to the proportion of the regular dues that <u>expenditures</u> of first-category activities [germane activities] bear to <u>expenditures</u> for all Bar Association activities carried out during the year.  947 F.Supp. at 39 (emphasis added).

The First Circuit noted, "In addition to membership dues, however, the Colegio has other revenue sources, making it difficult to determine exactly what percentage of dues was actually used to pay for life insurance."  <u>Id.</u> at 294 n. 1.

The court held that under the First Amendment, the Colegio could compel members to purchase life insurance only if that requirement was "germane" to the purposes that justify the integrated bar association.  <u>Id.</u> at 296-302.  It also ordered the

3

issuance of a preliminary injunction "prohibiting the Colegio
from collecting from [Romero] that portion of his future annual
dues attributable to the mandatory life insurance" program. Id.
at 304. The court certified a question to the Supreme Court of
Puerto Rico to interpret the laws of Puerto Rico concerning the
authority of the Colegio to compel members to purchase life
insurance coverage as a condition of bar membership.  Id. at 305.
The Supreme Court answered that the Colegio was indeed authorized
to mandate that its members purchase life insurance, and the case
was remanded to this court.

On remand, this Court found "that the mandatory life
insurance program is not germane, and that Romero may not be
forced to pay for it through his membership dues." Romero III at
9.  The Colegio had argued that the life insurance requirement
was germane to the duty of the Colegio to care for the benefit of
its members.  It also argued that the availability of a group
life insurance policy would give the member-attorney the peace of
mind to provide "a higher quality of services to clients."
Rejecting these arguments, this Court held that defendants failed
"to link the life insurance program to the purposes that justify
compelled membership in the Colegio, i.e., regulating the legal
profession and improving the quality of legal services in Puerto
Rico." Romero III at 7.  Accordingly, the Court granted Romero an
award equal to that portion of his past annual membership dues,

4

from 1993 to 2000, which were attributable to the life insurance program.  For each year, the attributable portion was "equal to the ratio of the Colegio's total life insurance premium to its total dues collected in [that] year."  Id. at 15.  In addition, this Court made permanent the preliminary injunction ordered by the First Circuit, reproducing its language verbatim, to the satisfaction of all parties:

> This Court hereby enters an injunction as follows: Defendant Colegio de Abogados de Puerto Rico is hereby prohibited from collecting from Plaintiff Carlos A. Romero, Jr., that portion of his future annual dues attributable to the Colegio's mandatory group life insurance program.

Id. at 16.

The Colegio's persistent quest to fund a mandatory life insurance policy even after this injunction entered is the subject of a recent opinion, in which the First Circuit pointed out, "[D]espite the injunction, Colegio continued to provide life insurance funded by its members' annual dues after the district court's opinion became final . . . and did not otherwise advise its members that insurance need no longer be purchased." Romero IV at 47.  A class action was filed on June 27, 2006, and the life insurance program ended two months later.  The lower court certified two classes, granted summary judgment for plaintiffs and issued a permanent injunction barring Colegio from using its members' dues for purposes of operating the compulsory life insurance program.  Among other things, the First Circuit ruled

5

that the action was not moot in light of Colegio's "past obstinacy." Id. at 49.  The First Circuit affirmed with respect to the district court's finding of liability and its grant of injunctive relief, stating in relevant part, "[F]rom Romero onward, Colegio knowingly inflicted all of the insurance on willing and unwilling members alike in the teeth of a ruling that it was not entitled to do so . . . ." Id. at 53-54.

With respect to Romero individually, the Colegio complied with the permanent injunction every year through 2006, annually reducing Romero's membership dues by the required amount. Effective December 29, 2006, however, faced with the pending class action litigation described in Romero IV, the Colegio discontinued the purchase of its group life insurance policy.  On April 10, 2007, it set up a "montepio" devoted to compensating the families of deceased bar members.  After discontinuing its life insurance policy, the Colegio ceased reducing Romero's annual membership dues by any amount.

The longstanding Executive Director of the Colegio, José Montalvo, testified on behalf of the Colegio at a deposition.  He explained that a montepio is an "assistance fund" that provides benefits to people designated by the Colegio.  Under the montepio, if no person is designated by the member, the benefit goes on to the successors or heirs of the member according to inheritance preferences.  In contrast, under Puerto Rican law, if

6

there is no designee, the proceeds of a life insurance policy do not go to the heirs. (Montalvo Dep. 11:4-20.)  The maximum amount paid to the deceased's beneficiaries under the montepio is $7,000.  The montepio was initially funded in March 2007 with an initial $800,000 investment from the Colegio. (Id. at 39:20-21.) The total amount of expenditures for the Colegio in 2007 were $3,959,149. (Montalvo Dep., Ex. 1.)

There is conflicting information about how the montepio was funded.  The Colegio has multiple accounts.  Proceeds from the sale of notarial and forensic stamps are deposited into a stamp account (Id. at 17:4 - 6.) Membership dues are kept in another separate account if they are collected over the internet, but they are deposited into the operating account if they are collected by check. (Id. 19:5-16.)  Montalvo testified that the Colegio ended up paying the initial $800,000 from the operating account, but it is unclear whether the Colegio was able to segregate dues from this expense. (Id. at 40: 15 - 16.) Although the internal auditor told Montalvo that to establish the montepio money was going to be used from all sources other than dues, Montalvo did not know or check to see if the auditor was correct. (Id. at 22:21 - 25.)  He also did not know if the proceeds from the sale of forensic and notarial stamps, which under the Colegio's rules are also supposed to be used only on germane expenses, were used to pay for the montepio, but reports

submitted by the Colegio to the Supreme Court of Puerto Rico in 2007 and 2008 indicate that these funds were not used to finance the montepio. (Id. at 26.)

Montalvo's testimony was largely unhelpful in explaining how the montepio was actually funded.  When asked whether the montepio was "funded by either membership dues or the sale of forensic and notary stamps" – neither of which can go toward non-germane expenses – Montalvo responded that "[t]he intent or purpose when it was created – that is, when the montepio was created – is that money from members' dues would not be used." (Id. at 43-44.)  An examination of Colegio's 2007 budget reveals that it is possible that the Colegio did not use member dues, including Romero's dues, to fund the initial $800,000 investment in the montepio, but without relying on member dues, the Colegio would have had to rely at least in part on funds derived from the sale of notarial and forensic stamps, in violation of the Colegio's rules and conflicting with its reports to the Puerto Rico Supreme Court.[4] (Montalvo Dep., Ex. 1.)

Romero now moves to hold the Colegio in civil contempt, arguing that its establishment of the montepio and subsequent failure to reduce his annual dues by that portion attributable to

---

[4]    The total income in 2007 not including that available through the sale of notarial stamps and member dues was $678,614, meaning that Colegio would have to draw either on member dues or funds derived from the sale of notarial stamps to reach $800,000.

the montepio amounts to a continuing violation of this Court's
permanent injunction.

### III. DISCUSSION

In order to establish civil contempt, a moving party must
prove four elements: "(1) that the alleged contemnor had notice
that he was within the order's ambit; (2) that the order was
clear and unambiguous; (3) that the alleged contemnor had the
ability to comply; and (4) that the order was indeed violated."
United States v. Saccoccia, 433 F.3d 19, 27 (1st Cir. 2005)
(internal quotation marks and citations omitted).  The First
Circuit has often combined the second and fourth elements,
distilling the test down to the question of whether "the putative
contemnor has violated an order that is clear and unambiguous."
Id. (internal quotation marks and citations omitted).

In applying this test, courts must remember that "[t]he
judicial contempt power is a potent weapon." Id. at 28 (quoting
Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,
389 U.S. 64, 78 (1967))(internal quotation marks omitted).
Accordingly, it "must be exercised with restraint and discretion"
and "should be used sparingly and reserved for egregious
circumstances."  Mullane v. Chambers, 333 F.3d 322, 338 (1st Cir.
2003) (internal quotation marks and
citations omitted). These considerations have led courts to set
an extremely high bar for establishing contempt.  The moving

party must establish all of the elements by "clear and convincing evidence," Saccoccia, 433 F.3d at 27 (quoting Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991)) (internal quotation marks omitted), and the court "must read any ambiguities or omissions in . . . [the] order as redound[ing] to the benefit of the [party] charged with contempt." Id. (first and third alterations in original)(quoting NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990)).

The 2002 injunction prohibits the Colegio from "collecting from [Romero] that portion of his future annual dues attributable to the Colegio's mandatory group life insurance program." Romero III at 16.  At issue here are two separate parts of the 2002 injunction. First, the language addressing the Colegio's "mandatory group life insurance program," and, second, the word "attributable."

In regard to the "mandatory group life insurance program," the defendant argues that the injunction is ambiguous as to whether it prohibits spending Romero's dues on a montepio.  The Colegio seeks to distinguish a montepio and a life insurance policy by arguing that a montepio will pay out to an association member's estate even if no beneficiary is designated, whereas under a life insurance policy there are no beneficiaries unless one is specifically designated. (Montalvo Dep. 11:4-20.)

10

Because there is no material difference between a montepio and a group life insurance policy, the montepio falls within the prohibition of the injunction.  In essence, the Colegio argues that the montepio is not a group life insurance policy under the order's clear language.  The formal differences between a montepio and a group life insurance plan are not, however, sufficient to avoid the order's reach.  When considering whether a party is in contempt for failing to meet a court-imposed affirmative obligation, the First Circuit has applied a "substantial compliance" standard.  See AccuSoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir. 2001); Morales-Feliciano v. Parole Bd. of the Commonwealth of P.R., 887 F.2d 1, 4 (1st Cir. 1989); Fortin v. Comm'r of the Mass. Dep't of Pub. Welfare, 692 F.2d 790, 795 (1st Cir. 1982).  This standard reinforces that a court's inquiry into whether a party has violated an order must be case-specific and fact-bound.  In Fortin the First Circuit wrote that "'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which non-compliance affects that interest." Fortin, 692 at 795; see also Morales-Feliciano, 887 F.2d at 4-5.  In this case, the interest at stake is Romero's First Amendment right to ensure that his dues are spent solely on germane activities.  In this sense, the difference between a montepio and a group life

11

insurance plan is entirely immaterial.[5]  The 2002 order does not cover all non-germane expenses, but where an expense is functionally identical to a group life insurance plan and the sole difference between the expense and a group life insurance plan does not change the germaneness analysis in the slightest, the expense clearly falls within the order's scope.  Any other rule would permit parties to avoid the reach of an order to refrain from a specific activity by adjusting that activity in a minimal and technical way without changing the behavior the order was meant to address.

The word "attributable" is also contested.  Plaintiff asserts that the word's meaning should be defined with reference to Rule 5(B), which is cited in the First Circuit's ruling in Romero II.  Rule 5(B) requires the Colegio to calculate his reduced annual dues by taking the ratio of its germane expenses to its total expenses — thereby excluding any expenditures on non-germane activities — and then multiplying that ratio by the base rate for membership dues.  According to the Colegio, the effect of the word "attributable" is strictly cabined, such that if no funds derived from membership dues directly finance the

---

[5]      In fact, the difference between a montepio and a group life insurance plan appears to be mainly linguistic.  The English definition of the Spanish word "montepio," when used as a legal term, is a "charitable fund for incapacitated members of a group or guild, or for their widows and orphans." M.C. Mirow, Latin American Legal History: Some Essential Spanish Terms, 12 La Raza L.J. 43, 45 (2001).

montepio or other non-germane activities, then Romero is not entitled to any reduction whatsoever.  It points out that the court did not define the term by expressly incorporating Rule 5(B).

The Colegio's actions violate both the letter and spirit of the 2002 injunction.  Read in the context of <u>Romero II</u> and <u>Romero III</u>, the injunction targets the Colegio's unconstitutional dues-collection practices, and there is a strong argument that Colegio's activities here violated both the Federal Constitution and the Colegio's own rules, which were designed to protect the constitutional rights of members.  The Supreme Court of Puerto Rico promulgated this regulation, along with others, in response to litigation over the Colegio's use of member dues. <u>See</u> <u>Schneider v. Colegio de Abogados</u>, 187 F.3d 30 (1st Cir. 1999).  These regulations were designed to remedy the constitutional violations alleged in <u>Schneider</u>. <u>Romero II</u> at 295.  As Romero has noted, the language of 5(B) corresponds with a series of Supreme Court cases that prohibit membership associations from avoiding First Amendment restraints by using creative bookkeeping to show that non-germane activities are not funded directly by objecting-member dues.  In these situations dues still subsidize non-germane activities by allowing more available funds to be spent on non-germane expenses when they would otherwise go toward germane expenses.  <u>See</u> <u>Retail Clerks Int'l Ass'n, Local 1625,</u>

<u>AFL-CIO v. Schemerhorn</u>, 373 U.S. 746, 753-54 (1963).  Rule 5(B) prevents the Colegio from violating the First Amendment rights of its members in this way by forcing members to pay a percentage of funds equal to the ratio of germane expenses to all expenses, no matter what funds the Colegio formally uses to fund non-germane expenses.  As the Colegio has accepted, the montepio is a non-germane expense. (Mot. Hearing 15:15 - 17, December 8, 2009.) Under Rule 5(B) Romero should only have been responsible for a percentage of the dues paid by non-objecting members equal to the ratio of germane expenses, which would not include the montepio, to all expenses, including the montepio.

The First Circuit has stated that in order to be held in contempt, "the putative contemnor [must be] able to ascertain from the four corners of the order precisely what acts are forbidden." <u>Goya Foods</u>, 290 F.3d at 76.  The purpose of this rule is to ensure that parties have sufficient notice of an order's scope. <u>See</u> <u>Int'l Longshoreman Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, Int'l Longshoremen's Ass'n, Local 1291</u>, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."); <u>Project B.A.S.I.C.</u>, 947 F.2d at 17 ("This requirement of clarity derives from concepts of

14

fairness and due process."); <u>Hess v. New Jersey Transit Rail Operations, Inc.</u>, 846 F.2d 114, 116 (2nd Cir. 1988) ("No one may be held in contempt for violating a court order unless the order is clear and specific and leaves no uncertainty in the minds of those to whom it is addressed."). Given the history of this litigation and the longstanding application of Rule 5(B) to determine dues, the word "attributable" should be interpreted as referring to its formula for collecting dues, and this should have been clear and unambiguous to the Colegio.

The Colegio asserts it did not formally fund the montepio with member dues, but that claim has never been asserted under oath. In his deposition the Executive Director of the Colegio was unclear about how the Colegio actually funded the montepio. If the Colegio did not actually use dues, it would have had to have expended proceeds from the sale of notarial and forensic stamps; if so, it misrepresented itself to the Puerto Rico Supreme Court and violated its own rules regarding the use of these proceeds. Romero has not proven by clear and convincing evidence that the Colegio actually used his dues in funding the montepio.[6] But whether or not the Colegio actually expended dues on the montepio is not relevant here. Even if no dues money

---

[6]     In some ways, this should not be a surprise. As the First Circuit recognized in <u>Romero II</u>, the multiple funding sources make it difficult to determine what percentage of dues was actually used to pay life insurance, which is part of the reason Rule 5(B) was adopted. <u>Romero II</u> at 294 n.1.

actually went into the montepio, the Colegio did not follow the funding formula prescribed by this Court's 2002 injunction. Under this injunction, it should have accounted for the montepio and reduced Romero's funds in 2007 by about 20 percent (instead of 6.63 percent) for non-germane expenses.  I therefore find that the Colegio in fact violated the injunction by failing to reduce Romero's dues by the ratio of funds spent on the montepio to all expenses.[7]

Pursuant to its authority to issue civil contempt sanctions to "protect[] the due and orderly administration of justice and . . . mantain[] the authority and dignity of the court," Goya Foods v. Wallack Co., 290 F.3d at 78 (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980))(internal quotation marks omitted), the Court orders the Colegio to make Romero whole by reimbursing him the proportion of his 2007 and 2008 dues equal to the ratio of the amount the Colegio expended on the montepio to its total expenses.  The Court also awards Romero attorneys fees and costs expended in support of this motion. See Goya Foods, 290 F.3d at 78.

**ORDER**

---

[7]     Because the Colegio not only violated the more general prohibitions codified in its own rules, but also violated the terms of the 2002 injunction, this Court is the suitable adjudicator of this action even if Romero could have pursued administrative protections under Rule 6(C).

16

Plaintiff's Motion to Hold Defendant In Contempt, to Enforce Permanent Injunction, and For Sanctions [Docket No. 133] is **ALLOWED**.

Within 14 days an affidavit shall be submitted by Romero setting forth reasonable attorneys fees and costs and the amount of his 2007 and 2008 dues that should be refunded to him under this order. Any opposition shall be filed within 14 days thereafter.

/s/ PATTI B. SARIS
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE